**In re CIRRUS LOGIC SECURITIES LITIGATION.**

**And All Related Actions.**

**No. C–93–1591 WHO.**

United States District Court, N.D. California.

Nov. 1, 1996.

William S. Lerach, Charles S. Crandall, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Edward M. Gergosian, Kirk B. Hulett, Barrack Rodos & Bacine, San Diego, CA, Fredric Goldberg, Ronald Clark, Miki, Meyers, Beckett & Jones, Grand Rapids, MI, for plaintiffs.

David S. Steuer, Steven M. Schatz, Jerome F. Biern, Jr., Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

In this class action, plaintiff shareholders of defendant Cirrus Logic, Inc. ("Cirrus") sue Cirrus, and certain of its officers and directors, for securities fraud. At the request of the Court, defendants have filed three separate motions for summary judgment. For the reasons stated hereinafter, the Court grants defendants' motions for summary judgment in part, and denies them in part.

### I.

This is a federal securities class action alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934[1], and Rule 10b–5 promulgated thereunder,[2] by Cirrus, and certain of its officers and directors, during the class period of October 22, 1992 through April 26, 1993. The individual defendants are Michael L. Hackworth ("Hackworth"), Cirrus's founder, President, CEO, and Director; Sam S. Srinivasan ("Srinivasan"), Chief Financial Officer and Vice President of Finance; George N. Alexy ("Alexy"), Vice President of Marketing; Douglas J. Bartek ("Bartek"), Vice–President and General Manager of User Interface Products ("Bartek"); and William D. Caparelli ("Caparelli"), Vice President of Worldwide Sales.

Cirrus was founded in 1984 and designs, develops and manufactures semiconductor

---

1. 15 U.S.C. §§ 78j(b) and 78t(a), respectively. Section 20(a) provides for "controlling person" liability. The three summary judgment motions before the Court are primarily concerned with establishing that Cirrus made certain allegedly fraudulent statements, and appear to leave for a later date the determination of which of the individual defendants can be held liable for each of the statements. In any event, the parties do not argue the § 20(a) claims in these motions.

2. 17 C.F.R. 240.10b–5 (1996).

chips ("chips"), used in personal computers, that control disk drives, monitors, and fax modems. (Joint Statement of Undisputed Facts ("UF") ¶ 1.) During the class period, Cirrus had three principal divisions. (UF ¶ 2.) The Mass Storage (disk drive) Division made chips for disk drive makers, the User Interface Division made chips for graphics displays, and the Communications Division made chips for computer modems. (UF ¶ 2.)

Plaintiffs allege that by the end of the summer of 1992, Cirrus was aware that its Mass Storage Division was experiencing a decline in demand that would materially worsen. By October 1992, the beginning of the class period, Cirrus was allegedly aware that demand for its Mass Storage products was evaporating, yet defendants publicly stated that its business remained strong. Plaintiffs allege that Cirrus "cooked the books" for the third quarter of fiscal 1993 (ended December 31, 1992) to avoid revealing the fact and extent of the purportedly declining demand for its products. In particular, plaintiffs allege that Cirrus calculated its inventory reserves by a method that violated both its own internal accounting policy and Generally Accepted Accounting Principles ("GAAP"). Plaintiffs also contend that Cirrus improperly failed to recognize a $1.7 million shortfall between physical and book inventory in the third quarter, and that Cirrus improperly pulled in revenue from the fourth quarter to the third quarter. Plaintiffs argue that these allegedly improper accounting manipulations permitted Cirrus fraudulently to report increased revenues and earnings for the third quarter, thus keeping stock prices artificially high.

A number of sales of stock by corporate insiders took place in late October and during the month of November 1992. Between October 26 and November 2, 1992, Srinivasan sold 61,000 shares of his Cirrus stock. (UF ¶ 125.) Caparelli sold 30,000 shares of stock between October 28 and November 9, 1992. (UF ¶ 128.) Between November 6 and 10, 1992, Bartek sold 60,000 shares of stock previously subject to lockup restrictions. (UF ¶ 127.) On November 10, 1992, Alexy sold 10,000 shares of stock (approximately 8.3 percent of his total holdings), retaining there-

after 71,013 shares and 38,625 vested options. (UF ¶ 126.)

In December 1992, Cirrus announced its acquisition of. Pacific Communication Sciences, Inc. ("PCSI"), allegedly representing that the acquisition would have no impact on the third quarter results, and only a $.10 to $.15 impact on the company's earnings per share for the fourth quarter.

On April 26, 1993, Cirrus announced that its earnings per share for the fourth quarter would be lower than market expectations. Cirrus also announced that its previously reported third quarter results would be restated downward from $0.46 to $0.28 per share. One of the reasons given for the shortfall in fourth quarter earnings was a $4 million increase in Cirrus's inventory reserves. On April 27, the day after the end of the class period, the price of Cirrus shares dropped $6 to $14.50 per share, representing a drop of almost 30 percent.

Of the three separate summary judgment motions, the first motion concerns plaintiffs' allegations that Cirrus's preparation and issuance of its third quarter financial results constituted accounting fraud. The second motion discusses Cirrus's alleged liability for opinions by third-party securities analysts, and for Cirrus's private statements to one particular analyst. The third motion discusses Cirrus's alleged liability for its own public statements in conference calls, press releases, and filings with the Securities and Exchange Commission ("SEC") during the third and fourth quarters of fiscal 1993.

## II.

### A.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has made this showing, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2511, (citations omitted). When determining whether there is a genuine issue for trial, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

### B.

Rule 10b–5 of the Securities and Exchange Act of 1934 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b) (1996). To prove a violation of Rule 10b–5, plaintiffs must show "(1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages." *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996).

### 1.

■ Misrepresentations of material facts within the meaning of Rule 10b–5 typically involve misstatements of historical fact. A material misstatement need not be one of historical fact, however, to be actionable. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Both projections and "general expressions of optimism" may be actionable under the securities laws. *Id.* (citing *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489–92 (9th Cir.1974)); *see also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir.1992)) ("[s]tatements of reasons, opinions, or beliefs are 'factual' for purposes of the securities laws," and thus may be actionable, *unless* certain conditions are met).

■ There are three principal ways to shield forward-looking statements from actionability under Rule 10b–5. First, the statement will not be actionable if all of the following are true: "(1) ... the statement is genuinely believed, (2) ... there is a reasonable basis for that belief, and (3) ... the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *See id.* at 930 (quoting *Hanon*, 976 F.2d at 501). In order to "seriously undermine" the accuracy of the statement, undisclosed facts must "undermine [its] foundation[s]." *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir.1993).

The second way to shield such statements from actionability is through reliance on the precept that statements must be evaluated in context, "in light of all the information then available" (including information available to the market), to determine liability under the securities laws. *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). Pursuant to the "bespeaks caution" doctrine recognized by the Ninth Circuit, typically applied in cases involving a written document, "a court can rule as a matter of law ( [for example in] ... a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 185, 133 L.Ed.2d 123 and —— U.S. ——, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995) (citation omitted). More specifically,

[t]he doctrine holds that economic projections, estimates of future performance, and similar optimistic statements in a prospectus are not actionable when precise cautionary language elsewhere in the document adequately discloses the risks involved. It does not matter if the optimistic statements are later found to have been inaccurate or based on erroneous assumptions when made, provided that the risk disclosure was conspicuous, specific, and adequately disclosed the assumptions upon which the optimistic language was based.

*Id.* (quoting *In re Worlds of Wonder Sec. Litig.*, 814 F.Supp. 850, 858 (N.D.Cal.1993), *aff'd in part, rev'd in part*, 35 F.3d 1407 (9th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 185, 133 L.Ed.2d 123 and —— U.S. ——, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995)).[3] The mere inclusion of *some* cautionary language, however, will not suffice "to support a determination as a matter of law that defendants' statements were not misleading." *Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996).

Third, certain types of forward-looking statements are so vague that as a matter of law they are not actionable. *In re Caere Corporate Sec. Litig.,* 837 F.Supp. 1054, 1057 (N.D.Cal.1993).[4]

In considering whether the market was misled by a particular statement of optimism, courts should keep in mind that "[p]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company."

*Id.* at 1058 (quoting *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1481 (N.D.Cal.1992) (citation omitted), *aff'd,* 11 F.3d 865 (9th Cir.1993)); *accord In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1096 (N.D.Cal.1994), *aff'd,* 95 F.3d 922 (9th Cir.1996) (statements that company expected "increased sales" and "very strong fiscal 1993" not actionable).

Unlike affirmative statements, discussed above, omissions in the Rule 10b–5 context must be of material, actual *facts* (such as financial data) to be actionable. *See VeriFone,* 11 F.3d at 869.[5] Additionally, in a

---

3. Plaintiffs are correct in their assertion, however, that the "bespeaks caution" defense does not have unlimited breadth. First, the doctrine applies only when the optimistic and cautionary statements appear " 'within the four corners of [the same] document,' " *Pozzi v. Smith,* [1995–1996 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,967 at 93,669, 1995 WL 723191 (E.D.Pa. 1995) (citation omitted). *But see Anderson v. Clow,* Fed.Sec.L.Rep. (CCH) ¶ 98,367, 1994 WL 525256 (S.D.Cal.1994), (dismissing claim based on misleading statements to the press because risks were either disclosed in the prospectus or were not required to be disclosed), *aff'd sub nom. In re Stac Electronics Sec. Litig.,* 89 F.3d 1399 (9th Cir.1996). Second, the Ninth Circuit has also recognized that the doctrine reflects nothing more than "the unremarkable proposition that statements must be analyzed in context." *Fecht,* 70 F.3d at 1082 (quoting *Worlds of Wonder,* 35 F.3d at 1414).

4. In *Caere,* plaintiffs charged defendants with having misled the market by making overly optimistic statements regarding the company's revenue and earnings prospects. Specifically, plaintiffs objected to the following: (1) press releases announcing the introduction of new products, touting them as technological advancements, calling Caere a market leader in its field, and quoting Caere's Chief Operating Officer as saying

that Caere was "well-positioned" for growth; (2) a press release announcing 1992 financial results that stated 1992 had been an "exciting year," that Caere's revenues and earnings had reached "record levels," and that Caere had "expanded beyond [its] traditional markets"; and (3) Caere's annual report, which announced "continuing strong sales." 837 F.Supp. at 1057. The Court rejected plaintiffs' allegations for three reasons, the first of which was that they were too vague to be actionable. *Id.* at 1058. The Court relied for this conclusion in part on *Rogal v. Costello,* [1992–93 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,245 at 95,093–4, 1992 WL 426467 (N.D.Cal. Oct. 8, 1992), a case holding that representations by management that "indicated a more positive outlook for the June quarter" and that there was an "apparent upswing" in United States customers' buying intentions were similarly too vague to be actionable under the securities laws. *Caere,* 837 F.Supp. at 1058.

5. In holding that forecasts need not have been disclosed, and that failure to offer such forecasts did not render the statements that were made misleading, the Court stated, "[t]hese alleged nondisclosures are, in substance, failures to make a forecast of future events. Put another way, what the complaint avers is that VeriFone omitted to state the 'fact' that future prospects may not be as bright as past performance." *VeriFone,* 11 F.3d at 869.

"fraud on the market" [6] case such as this one, "the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources." *Apple,* 886 F.2d at 1115. Because of the heavy weight placed by the investing public on the statements and opinions of corporate insiders, however, in order to avoid Rule 10b–5 liability for material omissions, "any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." 886 F.2d at 1116 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

As a general rule, companies are not required to disclose internal forecasts. *See, e.g., Convergent,* 948 F.2d at 516 (company not required to disclose internal projections); *VeriFone,* 11 F.3d at 869 ("Absent allegations that VeriFone withheld financial data or other existing facts from which forecasts are typically derived … the forecasts need not have been disclosed"); *In re Lyondell Petrochemical Co. Sec. Litig.,* 984 F.2d 1050, 1052–53 (9th Cir.1993) (no duty to disclose projections indicating that 1989 income and revenues would be below 1988 levels, reasoning that "[a] corporation may be called upon to make confidential projections for a variety of sound purposes where public disclosure would be harmful"); *Marx,* 507 F.2d at 491 (company "need not detail every corporate event, current or prospective"); *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (management not required "to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking"); *In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1411 (9th Cir.1996) ("Issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It

may reveal the projection it thinks best while withholding others, so long as the one revealed has a 'reasonable basis' ") (quoting *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 516 (7th Cir.1989)).

Failure to disclose internal forecasts, moreover, does not render the statements that *were* made necessarily misleading. *See VeriFone,* 11 F.3d at 869 ("failure to make the omitted forecasts did not render other statements that were made misleading"); *accord In re Adobe Systems Sec. Litig.,* 787 F.Supp. 912, 918–19 (N.D.Cal.1992), *aff'd sub nom. Cloutier v. Adobe Sys.,* 5 F.3d 535 (9th Cir.1993) ("If the mere existence of differing implications (for future corporate performance) reasonably drawable from information available at the time a projection is made can create a triable issue of fact … then virtually every lawsuit alleging such a projection would, it seems, go to trial—for, indeed, every projection of corporate earnings is uncertain and subject to different predictive interpretations." *Id.* at 919.).

On the other hand, companies have a duty to disclose internal forecasts "made with … reasonable certainty," *Convergent,* 948 F.2d at 516, as well as "financial data and other material information upon which an internal forecast is based." *Provenz v. Miller,* 95 F.3d 1376, 1386 (9th Cir.1996) (citing *VeriFone,* 11 F.3d at 869) (reversing grant of summary judgment for defendants where company executive, disregarding reliable internal spreadsheet predicting $4,000,000 loss for the quarter, predicted quarterly earnings of approximately $624,000).

### 2.

According to the Supreme Court, materiality is "a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133 (proxy solicitation case). An omitted fact is material "if there is a substantial likelihood

---

**6.** Although in an ordinary § 10(b) case the plaintiff must prove reliance on a specific material misstatement or omission, under the "fraud on the market" theory first recognized by the Ninth Circuit in *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) and common to many

securities fraud class action cases, "the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market." *Apple,* 886 F.2d at 1113–14.

that a reasonable shareholder would consider it important in deciding how to vote," or that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32, 108 S.Ct. at 983 (adopting the *TSC Indus.* standard of materiality for the § 10(b) and Rule 10b–5 context).

The determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133 (footnote omitted). Like scienter, therefore, materiality is ordinarily best left to the trier of fact, *see Worlds of Wonder*, 35 F.3d at 1412 (citing *Hanon*, 976 F.2d at 500). Similarly, whether a particular public statement is misleading, or whether adverse facts were adequately disclosed, "is a mixed question to be decided by the trier of fact." *Fecht*, 70 F.3d at 1081 (citing *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir.1987), *cert. denied*, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987)) ("[L]ike materiality, adequacy of disclosure is normally a jury question") (internal quotation marks omitted).

Summary judgment may, however, be granted on the issue of materiality in appropriate cases. *Apple*, 886 F.2d at 1113. The standard is strict. As the Ninth Circuit explained in *Fecht*, "only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" 70 F.3d at 1081 (quoting *Durning*, 815 F.2d at 1268); *accord TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133.

### 3.

■ Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Recklessness may also satisfy the scienter element. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990) (*en banc*), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). Recklessness is defined as "a highly

unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care...." *Id.* (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977)). Insider trading "in suspicious amounts or at suspicious times" may be probative of scienter. *Apple*, 886 F.2d at 1117.

■ Scienter may be established in a number of ways, employing both direct and circumstantial evidence. *Provenz*, 95 F.3d at 1388 (citing *Worlds of Wonder*, 35 F.3d at 1425). One way to establish scienter is to show motive and opportunity. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 931 (9th Cir.1993), *cert. denied*, — U.S. —, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994) (citation omitted) (on a motion to dismiss, "motive and opportunity ... are sufficient to establish a basis for inferring ... fraudulent intent"). Another way is to provide circumstantial evidence of reckless or deliberate behavior. *See, e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983) (circumstantial evidence sufficient to prove scienter because of the difficulty inherent in proving state of mind); *In re Network Equip. Technologies, Inc. Litig.*, 762 F.Supp. 1359, 1362–63 (N.D.Cal.1991); *accord Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996).

In *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627 (9th Cir.1994), *cert. denied*, — U.S. —, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995), the Ninth Circuit held that, even where plaintiffs presented no evidence of defendants' actual knowledge or fraudulent intent, the evidence presented sufficed to defeat summary judgment because it permitted "a reasonable inference that 'the [defendants] had access to all information that was available and deliberately chose to conceal the truth.'"

Because plaintiffs must establish *each* of the four elements of a Rule 10b–5 claim in order to prevail, *see Paracor*, 96 F.3d at 1157, defendants may dispose of each claim on summary judgment merely by establish-

ing that they are entitled to judgment as a matter of law with respect to one or more of these four elements. Conversely, to defeat summary judgment, plaintiffs must establish that a dispute of material fact exists as to *each* element. Each of defendants' motions challenges (1) the existence of misrepresentations or omissions and (2) scienter. The three motions are discussed in sequence below.

## III.

The Court begins with defendants' motion for summary judgment on plaintiffs' allegations that Cirrus's preparation and issuance of its third quarter 1993 financial statements constituted accounting fraud. Plaintiffs' claims of accounting fraud are based on three theories. First, they allege that defendants caused Cirrus to understate its inventory reserves and, thus, overstated or inflated its reported net income and earnings per share. Second, plaintiffs allege that Cirrus should have booked a $1.7 million variance between book and physical inventory in the third quarter of 1993. Third, plaintiffs contend that Cirrus improperly recognized revenue in the third quarter of 1993 that should have been recognized in the fourth quarter.

## A.

Plaintiffs' first argument is that Cirrus's alleged deviation from its undisclosed internal inventory reserve policy, in setting inventory reserves for the third quarter of fiscal year 1993, constituted fraud. Alternatively, plaintiffs argue that the inventory reserves actually calculated for the third quarter of fiscal 1993 were so unreasonable as to violate GAAP [7] and constitute accounting fraud.

As a preliminary matter, it should be noted that GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management. *Thor Power Tool*

*Co. v. Commissioner,* 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979). (*See also* Def.Ex. 812, APB Op. No. 22 ("Applying generally accepted accounting principles requires that judgment be exercised as to the relative appropriateness of acceptable alternative principles and methods of application in specific circumstances of diverse and complex economic activities."); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1021 (5th Cir.1996) (citation omitted) (GAAP "is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any variety of acceptable accounting procedures when that accountant prepares a financial statement.' ")). Even at the pleading stage, the Ninth Circuit has held that plaintiffs must set forth facts explaining why the allegedly fraudulent accounting decision "is not merely the difference between two permissible judgments," because flexible accounting concepts "do not always (or perhaps ever) yield a single correct figure." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549 (9th Cir.1994) (*en banc* ).

### 1.

Cirrus's publicly disclosed policy was to state inventory at "the lower of standard cost, which approximates actual cost on a first-in, first-out basis, or market...." (Def.Ex. 702, Cirrus 1992 Annual Report at 24; Def.Ex. 734, Cirrus 1993 Annual Report at 29.) The parties agree that GAAP includes the principle that inventory be valued at the lower of cost or market. (UF ¶ 6.) Plaintiffs' accounting expert acknowledges that this policy complied with GAAP. (Murovitz Decl. at ¶ 10; *Accord,* Murovitz Decl., Ex. B, ARB No. 43, ch. 4, Statement No. 5.)

If a company determines that it is probable that the inventory cost reflected on its books is greater than the value for which the inventory can be sold, it must establish an "inventory reserve" to cover the difference.

---

**7.** "GAAP consists of the official publications of the American Institute of Certified Public Accountants ("AICPA"). These official publications consist of Accounting Principles Board ("APB") opinions, Financial Accounting Standards Board ("FASB") Statements, and Accounting Research Bulletins ("ARB"). In the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP." *Providence Hosp. of Toppenish v. Shalala,* 52 F.3d 213, 218 n. 7 (9th Cir.1995).

(Srinivasan Decl.[8] at ¶ 18; Murovitz Decl. ¶ 10 and Ex. B, ARB No. 43, Ch. 4, Statement 5; Def.Ex. 824, FASB Statement of Financial Accounting Standards No. 5 at ¶ 8.) This may occur if the company anticipates that the market value of its inventory will drop below cost, or that it may not be able to sell all of its inventory. (Srinivasan Decl. ¶ 18.) Thus, an inventory reserve is essentially a write-off of inventory that is unlikely to be sold, or that will be sold for less than cost. (Thornbrugh Dep.[9] at 8:20–9:11.) One could also characterize an inventory reserve as a company's forecast of future demand for its products.

Cirrus's internal written inventory reserve policy provided for establishment of an inventory reserve for products with Equivalent Finished Goods Units in excess of demand over the subsequent 120–day period. (UF ¶ 13.) The policy provided that the reserve could be waived at management discretion if significant booked backlog existed outside the 120–day window. (UF ¶ 13.) The policy also specifically exempted from the 120–day reserve requirement inventory put in place as a result of a specific volume purchase agreement. (UF ¶ 13.) (*See* Def.Ex. 4, Inventory Reserve Policy, dated Nov. 20, 1991.) Thus, generally, Cirrus's internal policy provided for the calculation of a "120–day demand reserve" for existing inventory that it estimated would not be sold within 120 days. (Srinivasan Decl. ¶ 19; Thornbrugh Decl. ¶ 12.)

It is undisputed that, for the third quarter of fiscal 1993, Cirrus management reduced the 120–day demand reserve by $3.46 million based on factors other than significant booked backlog or inventory put in place as a result of a volume purchase agreement. (UF ¶ 15.) Thus, the initial issue before the Court is whether there exists a triable issue of fact as to whether Cirrus's reduction of the 120–day demand reserves for various products was in itself fraudulent.

Cirrus argues that its inventory reserve policy was merely a starting point for determining the proper inventory reserve to comply with GAAP. (Srinivasan Decl. ¶ 23; Thornbrugh Decl. ¶ 16.) The 120–day demand reserve was calculated by the cost accounting department's computer system. (Srinivasan Decl. ¶ 19; Thornbrugh Decl. ¶ 12.) Numerous Cirrus executives then evaluated the 120–day demand reserve to decide whether it accurately valued the inventory in accordance with Cirrus's publicly-disclosed accounting policy and GAAP. (Srinivasan Decl. ¶ 20; Thornbrugh Decl. ¶ 13.) Cirrus frequently adjusted the 120–day demand reserve based on its business judgment, which took into consideration such factors as demand beyond 120 days, longer production lead times, cross-shippability of products, and management's knowledge of the overall computer market and the market for Cirrus's products. (Srinivasan Decl. ¶ 22; Thornbrugh Decl. ¶ 14.). Susan James of Ernst & Young ("E & Y") testified that nothing in GAAP requires that there be a strict 120–day demand reserve, and that ongoing adjustments to the demand reserve would almost have to be made to comply with GAAP. (James Dep. at 31:12–19.) Judge Jensen of this Court has previously held that GAAP does not require that reserves be set at any predetermined level. *Leonard v. NetFRAME Sys., Inc.,* [Current Tr. Binder] Fed.Sec.L.Rep. ¶ 98,982 at 93,-780, 1995 WL 798923 (N.D.Cal. Aug. 8, 1995).

Plaintiffs argue that Cirrus had no reasonable basis for deviating from its inventory reserve policy by reducing the 120–day reserves. According to plaintiffs, this subjectivity in calculating the reserves removed the required comparability and consistency from the calculation of inventory reserves. (Murovitz Decl. ¶¶ 17–18.) Although a company's internal accounting policies may be relevant to show how the company complied, or failed to comply, with GAAP, however, there can be no claim of fraud based merely on a company's deviation from its own undisclosed internal accounting policies.[10] *Cf. In*

---

**8.** Srinivasan was Chief Financial Officer of Cirrus during the class period.

**9.** Thornbrugh was the Operations Controller for Cirrus during the class period.

**10.** Where, however, a company deviates from its own procedures in a way that violates GAAP, that deviation from internal policy may be evidence of scienter. *Provenz,* 95 F.3d at 1389.

*re Worlds of Wonder Sec. Litig.,* 147 F.R.D. 214, 216–17 (N.D.Cal.1992) ("The audit manuals do not establish the standards against which Deloitte's conduct of the WOW audit is to be measured. That standard is established by GAAS and GAAP, publicly disseminated standards recognized throughout the accounting industry. . . . It is . . . unfair to use professionals' self-imposed standards, which may exceed industry standards, against them to try to prove fraud. This violates public policy which encourages the highest standards, in order to protect the public"). The issue, then, is, whether Cirrus's reserve decisions complied with GAAP, and with Cirrus's *publicly* disclosed policy of valuing inventory at the lower of cost or market value, not whether Cirrus complied with its undisclosed internal reserve policy.

Plaintiffs also argue that Cirrus fraudulently failed to disclose that it changed its method of accounting for excess and obsolete inventory during the class period. Plaintiffs have submitted no evidence that Cirrus changed its publicly disclosed practice and policy of valuing inventory at the lower of cost or market during the class period. (*See* Murovitz Decl., Ex. F, APB Op. No. 28, ¶ 23 ("Each report of interim financial information should indicate any change in accounting principles or practices from those applied in (a) the comparable interim period of the prior annual period, (b) the preceding interim periods in the current annual period and (c) the prior annual report.").)

With respect to changes in its internal policy, Cirrus presents evidence that it has always injected a subjective element into its inventory reserve decisions to adjust the 120–day inventory reserve, and cites to E & Y work papers from earlier quarters. In the third and fourth quarters of fiscal 1992, for example, Cirrus reduced the system-generated 120–day inventory reserve by $1.432 million and $1 million, respectively. (Eicholz Decl. ¶¶ 11–14; Def.Exs. 801, and 810.) E & Y specifically addressed this issue in the fiscal 1993 audit: "[The] reserve has then been adjusted by consideration of the 180 day demand and any other known factors. This methodology of judging down the systematically determined 120 day demand is

consistent with Company policy and the Company's prior practices." (Def. Ex. 806; Eicholz Decl. ¶ 27.) Thus, even assuming that Cirrus was required to disclose to the market any changes in its undisclosed internal method of calculating inventory reserves, which it was not, Cirrus has shown that it did not calculate the inventory reserves differently in the third quarter of fiscal 1993 than in previous quarters.

Plaintiffs also argue that Thornbrugh testified that Cirrus's inventory reserve policy changed as a result of its acquisition of Acumos in April 1992. Thornbrugh actually testified, however, that the way that the inventory reserves were calculated prior to the acquisition of Acumos was probably closer to the letter of Cirrus's undisclosed internal reserve policy than afterwards. (Thornbrugh Decl. at 172:9–173:23.) Because there is no cause of action under the federal securities laws merely for deviating from an undisclosed internal accounting policy, Thornbrugh's testimony does not raise a disputed issue of material fact as to whether Cirrus's inventory reserve calculations were fraudulent.

Plaintiffs contend that Cirrus was required to disclose in its financial statements that it had reduced the 120–day demand reserve. Again, there is no such duty. Because nothing in GAAP requires that inventory reserves be set at a 120–day demand reserve level, ongoing adjustments to reserves that otherwise comply with GAAP need not be disclosed.

Accordingly, the Court finds that plaintiffs have failed to raise a genuine issue of material fact to defeat summary judgment on their claims that Cirrus's alleged deviations from its undisclosed internal reserve policy in the third quarter of fiscal 1993, without more, constituted accounting fraud.

2.

As discussed above, plaintiffs present no evidence that Cirrus deviated from its publicly disclosed inventory reserve policy at any time during the class period. Thus, the Court now turns to whether the inventory reserves set by Cirrus in third quarter of fiscal 1993 complied with GAAP. This requires evaluation of the reasonableness of the

reserve decisions. A company's determination of inventory reserves, like other types of forecasts, is considered fraudulent only if plaintiffs can show that the company lacked a reasonable basis for the determination. *See VeriFone,* 11 F.3d at 870; *Worlds of Wonder,* 35 F.3d at 1426 (plaintiff must prove that the accounting practices were so deficient that no reasonable accountant would have made the same decision).

Under GAAP, management is responsible for establishing a process for preparing accounting estimates, although the process need not be documented or formally applied. (Murovitz Decl., Ex. C, AICPA Professional Standards, Auditing Accounting Estimates § 342.05.) Indeed, GAAP approves of the use of subjective criteria in determining financial estimates.

> Management is responsible for making the accounting estimates included in the financial statements. *Estimates are based on subjective as well as objective factors and, as a result, judgment is required to estimate an amount* at the date of the financial statements. Management's judgment is normally based on its knowledge and experience about past and current events and its assumptions about conditions it expects to exist and courses of action it expects to take.

(Murovitz Decl., Ex. C., AICPA Professional Standards, Auditing Accounting Estimates § 342.03 (emphasis added).) Even Cirrus's 120–day demand reserve contained elements of subjectivity because it was based in part on the "current month demand forecast." (Def. Ex. 4.) An auditor's objective when evaluating management's accounting estimates is to ensure that the accounting estimates were reasonable under the circumstances. (Murovitz Decl., Ex. C., AICPA Professional Standards, Auditing Accounting Estimates § 342.07.)

Courts in this district have granted summary judgment in accounting fraud cases even where the opposing party has provided a declaration from an accountant attesting that the accounting practices at issue did not meet the applicable professional standards. *See, e.g., In re Software Toolworks, Inc. Sec. Litig.,* 789 F.Supp. 1489, 1504 (N.D.Cal.1992)

*aff'd in relevant part and rev'd in part,* 50 F.3d 615, 628–29 (9th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995) (granting partial summary judgment for defendant auditors and holding that whether inventory reserve should have been higher was a matter of judgment on which the parties disagreed, not a basis on which to infer scienter); *Mathews v. Centex Telemanagement, Inc.,* [1994–95 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,440 at 91,037, 1994 WL 269734 (N.D.Cal.1994) (granting summary judgment for defendants because plaintiffs' claims about how reserves should have been calculated "are only differences in business judgment viewed from hindsight"; "[t]he jury need not be given the task of deciding whose proffered method is more reasonable").

Before Cirrus publicly released its financial statements, Cirrus disclosed its reserve decisions to E & Y and discussed them. (Berry Decl. ¶ 7; Eicholz Decl. ¶ 5.) At the end of fiscal 1993, E & Y audited Cirrus's financial statements and concluded that the inventory reserve decisions were reasonable. (Eicholz Decl. ¶¶ 24–27; Def.Ex. 734, 1993 Annual Report at 33; Def.Ex. 202, E & Y 3rd qtr. work papers; Def.Ex. 806, E & Y 3/31/93 inventory reserve mem.) E & Y never required Cirrus to change a reserve decision. (Srinivasan Decl. ¶ 24.)

Plaintiffs argue that the reduction from the 120–day demand reserve was unreasonable because, during the class period, Cirrus's inventory was increasing at a significantly faster rate than its revenue. (Murovitz Decl. ¶ 25.) Cirrus's revenues for the three months ended December 31, 1992 increased 20 percent from the previous quarter, while gross inventories increased 35 percent. (Murovitz Decl., citing Pl.Ex. 201 at EY2 03902–06.) Inventory turns, a ratio that measures the number of times inventory is turned over during the year, decreased from 6.26 for the first five months of fiscal 1993 to only 5.08 for the four months ended December 31, 1992. (Murovitz Decl., citing Def.Ex. 202 at EY2 03958.) According to plaintiffs' expert, low inventory turnover can indicate poor liquidity, possible overstocking, or obsolescence.

(Murovitz Decl. ¶ 26, n. 5.) Plaintiffs' expert contends that the decreases in inventory turns were a significant trend indicative of deteriorating quality of inventory. (Murovitz Decl. at ¶ 27.)

Defendants respond that neither total inventory for all Cirrus products, nor the rate of turns for all products, has any bearing on the issue whether the reserve set for a specific product was reasonable. Moreover, they contend, Cirrus's gross inventory had risen because of increasing sales and to meet the future demand for Cirrus's products. (Def.Ex. 500; Thornbrugh Decl. ¶ 38.) Cirrus's net sales increased from $217.6 million in fiscal 1992 to $354.8 million in fiscal 1993 to $544.1 million in fiscal 1994. (Def. Ex. 723, Cirrus's 1994 Annual Report at NC 000182). In his deposition, Murovitz acknowledged that there is no evidence that Cirrus did not consider its gross inventory, its reserves as a percentage of gross inventory, and its inventory turns in making its reserve decisions. (Murovitz Dep. at 106:24–107:6, 108:8–11.) Murovitz acknowledged that he was unaware of any provision in GAAP that requires an increase in reserves when inventory grows at a faster rate than sales over a three month period. (Murovitz Dep. at 107:11–14.) He also conceded that inventory turns may drop as a company grows in size, and that this may not be a problem for the company. (Murovitz Dep. at 107:23–108:27.) Murovitz testified that he had no idea whether Cirrus's reserves had been reduced from those of the second quarter of fiscal 1993; his comments about Cirrus's reduction in reserves refer only to a reduction from the 120–day demand reserve, which the Court has already held is a problem only if that reduction violates GAAP. (Murovitz Dep. at 106:9–21.)

Plaintiffs' expert also argues that Cirrus's reliance on E & Y for a determination of the adequacy of its inventory reserves was unreasonable, because E & Y performed no professional service that required E & Y to determine whether Cirrus adhered to GAAP in the preparation of Cirrus's third quarter financial information. (Murovitz Decl. at ¶ 32.) Plaintiff argues that E & Y's fiscal 1993 year-end audit opinion also provides no basis for assessing the reasonableness of Cirrus's inventory reserves, as it is based almost entirely on representations by Cirrus management that were not independently confirmed. (Murovitz Decl. at ¶¶ 35–36.) Steven Berry, who performed E & Y's third quarter consultation work regarding inventories, testified that E & Y did no testing on balance sheet accounts. (Berry Dep. at 18:22–25, 54:1–16.) Susan James testified that E & Y's consultation with regard to the third quarter financial results involved very limited analytical procedures, and that E & Y was not asked to issue a review report. (James Dep. at 14:10–22.)

Berry's declaration submitted in support of Cirrus's motion for summary judgment states, however, that "[i]n the course of the third quarter consultation, I analyzed judgmental reductions to product-specific user interface reserves totaling $2.058 million. E & Y concluded that the judgments appeared reasonable." (Berry Decl. ¶ 19, citing Def. Ex. 202.) E & Y's contemporaneous workpapers from the period do contain notations demonstrating that E & Y analyzed the numbers and information presented to them by Cirrus management and concluded that "[o]verall, the judgment applied to the demand reserve to reduce the system generated reserve appears reasonable." (Def.Ex. 202 at EY2 03944–45.)

In their opposition to defendants' motion for summary judgment, plaintiffs challenge the actual reserve calculations for only four of Cirrus's products.

■ a. *Mercury C.* Defendants present evidence that Cirrus reduced the inventory reserve by $74,000 due to demand from Conner. (Def.Ex. 385, referring to "Conner liability buffer.") Mercury C is part of the Mass Storage group. E & Y reviewed the decision and stated "the most recent sales forecast shows an increase in demand from the forecast used to initially value this inventory. This appears consistent with my review of the forecast." (Def.Ex. 202 at EY2 03945.) Berry states in his declaration that "I specifically analyzed the judgmental reduction to the demand reserve for one mass storage product, Mercury E + +, and concluded that the company's judgment was rea-

sonable based on the facts known to management." (Berry Decl. ¶ 20.) Plaintiffs argue that this decision was unreasonable because Cirrus's January 14, 1993 demand forecast shows that Mercury demand decreased by 154,700 units from the December 15, 1992 demand forecast. (Def.Ex. 822 at CIR 338591.) A January 14 memorandum, however, indicates that Conner was likely to need 126,000 additional units of Mercury, and that the order was likely to come before the end of the week. (Def. Ex. 215.) As of December 31, 1992, Cirrus had only 120,800 units of Mercury C in excess of the projected 120–day demand, less than the anticipated Conner order. (Def.Ex. 385 at CIR 094440.) The Court finds that plaintiffs *have not* raised a material issue of fact as to whether Cirrus's reduction in the 120–day inventory reserve for the Mercury products was reasonable.

b. *GC 45 D–Servo.* Cirrus reduced the 120–day demand reserve by $427,000. (Def. Ex. 385.) Around the time Cirrus was reducing the reserve for this product, it was also identifying GC 45 as a potential writeoff. (Pl.Ex. 10.) Moreover, the January demand forecast showed a dramatic decrease in the six-month demand for this product compared to the December forecast. (Def.Ex. 822 at CIR 338593.) Plaintiffs also argue that although the reduction in inventory reserves for GC 45 was the largest reduction to third-quarter Mass Storage demand reserves, it was not even shown to E & Y. Although defendants contend that the amount of inventory on hand was below E & Y's materiality threshold and, thus, was too low to be reviewed during the quarterly consultation, they do not submit any evidence of E & Y's materiality threshold. Thornbrugh avers that GC 45 was a product typically booked and shipped in a period shorter than the manufacturing lead time; Cirrus reduced the reserve to zero because it believed that it could sell all of this product. (Thornbrugh Decl. ¶ 24.) Thornbrugh also avers that Cirrus and Conner had entered into a "die bank agreement" under which Conner was liable for at least 50,000 units of GC 45 even if the product was not consumed. (Thornbrugh Decl. ¶ 24.) Defendants do not cite to any evidence before the Court of the terms of this "die bank agreement." Viewing the evidence in the light most favorable to plaintiffs, the Court finds that plaintiffs *have* raised a genuine issue of fact as to whether Cirrus's reduction in the 120–day inventory reserve for GC 45 D–Servo was reasonable.

c. *Raven II.* Defendants submit evidence that Cirrus reduced the 120–day demand reserve for Raven II by $204,000 because of six-month demand. (Def.Ex. 385 at CIR 094450.) Raven is part of the User Interface group. E & Y found this reduction in the 120–day demand reserve to be reasonable because it was due to longer lead times and increased product demand. (Def.Ex. 202 at EY2 03944–45; Def.Ex. 500 at EY 01479.) Plaintiffs argue that the January demand forecast reflected a decrease in demand for Raven II. There is no citation to evidence for this contention, and defendants' Exhibit 822 does not appear to contain a projection for the Raven product. Rather, the January 1993 demand forecast showed a projected demand for Raven II of 56,800 units for May and June 1993; this six-month demand accounted for almost all of the 59,500 units in excess of the 120–day demand. (*Compare* Def. Ex. 740 at CIR 524744 *with* Def.Ex. 385 at CIR 094453.) The Court finds that plaintiffs *have not* raised a material issue of fact as to whether Cirrus's reduction in the 120–day inventory reserve for the Raven products was reasonable.

d. *Stingray.* Cirrus reduced the 120–day demand reserve for the Stingray group of products by $599,000 (175,000 units). (Def.Ex. 385 at CIR 094450.) This reduction was based on Stingray's prior success. (Solari Decl. ¶ 20.) Stingray was a successful product, having netted billings of more than $2 million in the third quarter of fiscal 1993. (Def.Ex. 770.) The 270–day demand for the product reduced the excess product on hand to 58,200 units. (Def.Ex. 740 at CIR 524745.) In addition, Cirrus envisioned that price breaks would boost sales in future quarters, while still enabling Cirrus to sell the product at a reasonable profit. (Solari Decl. ¶ 20; Def.Ex. 202 at EY2 03946.) Plaintiffs argue, however, that E & Y recognized that Stingray was an "end-of-life" product. (Def.Ex.

202.) Moreover, while defendants claimed that price breaks would increase sales, Cirrus's demand forecast did not envision a significant increase in demand for the Stingray products. (Def.Ex. 740.) Plaintiffs note that even defendants acknowledged that the amount of Stingray on hand in December 1992 was unlikely to be sold within the subsequent nine months.

Defendants contend that plaintiffs' allegations are nothing more than Monday morning quarterbacking. Even plaintiffs' expert Murovitz testified that there is "[n]ot a right answer to the determination of what a reserve should be" because professionals might interpret things differently based on the same set of facts. (Murovitz Dep. at 21:14–22:1.) Nevertheless, the Court finds that there is a triable issue of fact as to whether Cirrus's reduction of the 120–day inventory reserves for the Stingray product was a reasonable accounting decision in compliance with GAAP.

### 3.

Because the Court has found that disputed issues of fact exist with respect to the reasonableness of Cirrus's reductions in inventory reserves for the GC 45 D–Servo and Stingray products, the Court proceeds to discuss scienter.

As outlined above, defendants have offered evidence that they made extensive disclosure to, and voluntarily consulted with, E & Y on all material accounting reserve decisions, in an effort to seek the accounting firm's guidance and approval. This conduct tends to negate an inference of scienter. *But see Provenz*, 95 F.3d at 1389 (where defendants failed to disclose material information to their accountant, defendants will not be able to rely on their accountant's advice as proof of good faith).

■■■ The mere publication of inaccurate accounting figures, or failure to follow GAAP, without more, does not establish scienter. *Worlds of Wonder*, 35 F.3d at 1426. Deviations from a company's internal accounting policies, however, may provide evidence of scienter if those deviations also violate GAAP. *See Provenz*, 95 F.3d at 1389. Plaintiffs have presented evidence of such

deviations in the calculation of the GC 45 D–Servo and Stingray inventory reserves. Neither party has addressed the issue of materiality, but "only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" *Fecht*, 70 F.3d at 1081 (quoting *Durning*, 815 F.2d at 1268); *accord TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133. Accordingly, the Court finds that plaintiffs have raised a genuine issue of material fact as to whether Cirrus's reserve reduction decisions for the GC 45 D–Servo and Stingray products constituted accounting fraud in violation of Rule 10b–5.

### B.

■■■ It is undisputed that Cirrus discovered a $1.7 million apparent shortfall between physical and book inventory in the third quarter of fiscal year 1993. (UF ¶ 43.) Cirrus's cost accountant, Robert Krompholz, wrote a memorandum to Srinivasan on December 21, 1992, in which he recommended that the entire amount be written off before year end. (Pl.Ex. 181.) Nevertheless, Cirrus did not recognize the loss on its December 31, 1992 financial statement. (Krompholz Dep. at 61:16–62:23.) Plaintiffs contend that Cirrus's failure to recognize the loss in its third quarter financial statements was fraudulent.

When the inventory variance was discovered, Srinivasan ordered that it be investigated. (Srinivasan Dep. at 161:10–15; Krompholz Decl. ¶ 12.) He told Thornbrugh that, because Cirrus had an excellent record with respect to variances, the shortfall should not be booked until Cirrus was sure that it really happened. (Srinivasan Decl. at 161:16–25.) By the third week of December, Krompholz and the inventory control task force had determined that the variance existed primarily because test engineers had removed product from inventory without checking it out on the computer system. (Krompholz Decl. ¶ 13.) Cirrus then tried to determine whether the inventory that had been removed by test engineers could be returned to production and sold, or whether it was defective inventory for which the company could re-

ceive credits from its fabrication subcontractors. (Krompholz Decl. ¶ 13.) By December 21, Krompholz had determined that at least $0.5 million of the variance would be eliminated through receipt of fabrication credits or by returning the product to production. (Pl.Ex. 181.)

Cirrus continued to investigate the variance, and, by January 13, 1993, had reduced it to $653,000. (Krompholz Decl. ¶ 14; Def. Ex. 735.) By the end of the fourth quarter, the variance was reduced to $203,000, which was booked at that time. (Srinivasan Decl. ¶ 36; Krompholz Decl. ¶ 14.)

Srinivasan testified that he discussed the variance with E & Y in the third quarter and could not recall E & Y's having made any recommendation that Cirrus should expense any of the inventory variance in the third quarter. (Srinivasan Decl. ¶ 38; Srinivasan Dep. at 162:24–163:25.) Other than Srinivasan's statements in this litigation, however, there is no evidence that such a consultation with E & Y occurred.

Krompholz now contends that his original opinion, that the variance should be recognized in the third quarter financial statements, was premature, and would have resulted in inventory's being understated by over a million dollars. (Krompholz Decl. ¶ 15.) Plaintiffs' expert Murovitz contends that Krompholz's original opinion was correct, and that the loss should have been recognized in the third quarter financial statements. (Murovitz Decl. ¶ 40–41.)

GAAP provides that an estimated loss from a loss contingency should be accrued by a charge to income if, prior to the issuance of financial statements, it is determined that it is probable that the loss had occurred, and the amount of loss can be reasonably estimated. (Murovitz Decl., Ex. K, FASB Statement of Financial Accounting Standards No. 5, ¶ 8.) Krompholz's contemporaneous memorandum, however, shows that the variance was being investigated, that the investigation to date had significantly reduced the variance, and that investigation was ongoing. (Pl.Ex. 181; Krompholz Decl. ¶ 14.) Under those circumstances, the Court concludes that, as a matter of law, it cannot be said that it is probable that the loss actually occurred, nor that the amount of the loss reasonably could have been estimated. Plaintiffs have submitted no evidence to the contrary. Thus, the Court finds no genuine dispute of material fact as to whether Cirrus's decision not to book the inventory variance in the third quarter complied with GAAP.

### C.

Finally, plaintiffs argue that Cirrus improperly recognized revenue in the third quarter of fiscal 1993 by making a last-minute shipment to a warehouse (on December 31, 1992) for delivery during the fourth quarter to its customer Seagate. (Pl. Ex. 208.) The two primary criteria for revenue recognition are that the revenue be both earned and realizable, meaning that the revenue is collectible from, or represents a valid claim against, the customer. (Murovitz Decl. ¶ 43, and Ex. L, FASB Statement of Concepts No. 5, ¶ 83.)

Shipments made to a warehouse or other intermediate location without the instruction of the customer are considered improper and unusual revenue transactions. (Murovitz Decl. ¶ 45, and Ex. M, AICPA Practice Alert No. 95–1.) Dave Friedrich, Seagate's purchasing agent, testified at deposition that he would not know if Cirrus shipped product to a warehouse for later delivery, and that Seagate would have no reason to request that Cirrus do so. (Friedrich Dep. at 40:8–13.). Peter Smiderle, Cirrus's sales manager for Seagate, testified that shipping the product from Cirrus to a warehouse, instead of shipping it directly to Seagate, allowed Cirrus to capture the shipment as revenue. (Smiderle Dep. at 33:1–25.)

Cirrus's revenue recognition policy, however, permitted revenue to be recognized if the product was shipped before the end of the quarter and had a customer request date within fourteen days of the end of the quarter. (Def.Ex. 805 at ¶ 5.10.) Seagate had approved receipt of the product within the fourteen-day window, the product was delivered within the fourteen day window, and Seagate paid in full for the shipment. (Thornbrugh Decl. ¶¶ 80–83.)

Plaintiffs' argument that Cirrus's fraudulently failed to disclose that its financial forecasts included such "pull-ins" of revenue fails as a matter of law.

> "[P]ull-ins" are not the nefariously manipulative scheme that plaintiffs make them out to be. "Pull-ins" do not result in the improper recognition of revenue under generally accepted accounting principles. They are actual sales which are treated no differently than any other sale, i.e., revenue is recognized upon shipment to the customer.

*In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1381 (N.D.Cal.1995).

Plaintiffs' claim that this particular "pull-in" was fraudulent also fails. Cirrus's revenue recognition policy provides that revenue is recognized on shipments to original equipment manufacturers such as Seagate when the products are transferred to a common carrier for delivery to the customer. (Def.Ex. 805 at ¶ 5.1.) The December 31, 1992 shipment was sent "F.O.B. Truck." (Def.Ex. 732.) Under the Uniform Commercial Code, Seagate owned the product upon shipment. Cal.Comm.Code §§ 2319, 2401(2)(a). Thus, this case is completely different from *Provenz*, 95 F.3d at 1383, where the Ninth Circuit found a material issue of fact existed as to whether revenue was improperly recognized prior to delivery and prior to the execution of binding contracts with customers.

Moreover, Cirrus conducted internal "ship-ahead" audits in every quarter to confirm that all shipments of a value greater than $75,000 that had been shipped during the last two weeks of the quarter had been requested by the customer within the fourteen-day window. (Srinivasan Decl. ¶ 42; Def.Ex. 805 at EY2 03244.) In the ship-ahead audit for the third quarter of fiscal 1993, Cirrus reviewed seventy-five transactions, totaling more than $15.3 million. (Def. Ex. 741.) Of these, plaintiffs challenge only this one $400,000 shipment to Seagate. In its fiscal year-end review, E & Y found Cirrus's ship-ahead audit to be comprehensive and thorough. (Def.Ex. 804; Eicholz Decl. ¶ 41.)

Plaintiffs have not raised an issue of material fact as to whether the recognition of revenue from the Seagate transaction failed to comply with GAAP. Even if they had, Cirrus's ship-ahead audit procedures, and the review and approval of those procedures by E & Y, would have negated any inference of scienter. *See, e.g., Hollinger*, 914 F.2d at 1569 (recklessness requires an extreme departure from standards of ordinary care). Accordingly, the claim must fail.

## IV.

The Court next turns to defendants' second motion for summary judgment, regarding plaintiffs' allegations that Cirrus is liable under Rule 10b–5 for misleading opinions about Cirrus contained in thirty-two analyst reports issued by third-party investment analysts during the class period, and for fraudulent statements made to investment analysts. Different legal standards apply to plaintiffs' two theories of liability, and the Court addresses them in sequence below.

### A.

■ A company can be liable for the opinions and statements of third parties only if the company "put [its] imprimatur, express or implied" on the third-party statements. *Stac*, 89 F.3d at 1410 (quoting *VeriFone*, 784 F.Supp. at 1486). To succeed on this theory of liability, typically employed where defendants have not made misleading statements directly, plaintiffs must show that "the company adopted, endorsed or sufficiently entangled itself with the [analysts' opinions] to render them attributable to [the company]." *Syntex*, 855 F.Supp. at 1097. Plaintiffs must "(1) identify specific [analyst opinions] and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred." *Caere*, 837 F.Supp. at 1059; *accord Fecht*, 70 F.3d at 1080 (suggesting that an allegation that misleading statements by securities analysts were prepared with the approval and guidance of the company was sufficient to state a claim against the company for securities fraud). The policy behind the adoption or entanglement requirement for this theory of

liability is that a company should not be held responsible for the opinions of a third party over which it has no control.[11]

There is no evidence on this record that Cirrus adopted any of the thirty-two analyst reports at issue. Four of the six securities analysts whose reports are at issue testified that Cirrus did not review or approve their reports before publication. (Chaudri Dep., Goldman Sachs & Co., at 38:16–19; Rajaratnam Dep., Needham & Company, Inc., at 11:4–7; Klesken Dep., Robertson Stephens & Company, at 16:8–22; Jansen Dep., Alex. Brown & Sons Incorporated, at 17:18–18:16.) The fifth analyst was not asked, and did not testify with respect to, whether he provided copies of his reports to Cirrus for comment before publication. (Lazlo, Jr. Dep., PaineWebber, at 42–44.) The sixth analyst, Millard Phelps, from Hambrecht & Quist, was not deposed. Each analyst deposed also testified that his reports were based on numerous sources of information other than Cirrus personnel. (Chaudri Dep. at 7:13–8:7; Rajaratnam Dep. at 6:12–20; Klesken Dep. at 11:19–12:16; Jansen Dep. at 38:24–39:12; Lazlo Dep. at 42:13–43:3.)

Cirrus's internal policy permitted only defendants Hackworth, Srinivasan, Bartek, Alexy and nondefendant Paula Jones to speak with financial analysts. (Def.Ex. 820.) Hackworth, Srinivasan, Bartek, and Alexy each stated, in their supplemental objections and responses to plaintiffs' fourth set of interrogatories, that although they could recall speaking with analysts, they never commented on analysts' financial projections, and never provided to analysts internal earnings or revenue forecasts or other specific financial guidance. (Def.Exs. 520 at 3, 578 at 3, 808 at 3, 809 at 3.) There is no evidence to the contrary.

Nor have plaintiffs submitted evidence that Cirrus adopted the analysts' statements *after* publication. That Cirrus kept track of analyst reports and published estimates is insufficient to show adoption of the reports. *In re Seagate Technology II Sec. Litig.*, [1994–95 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,530 at 91,583, 1995 WL 66841 (N.D.Cal. 1995) (tabulating analysts' forecasts not evidence of adoption); *Cypress*, 891 F.Supp. at 1378 (same).

Absent such a showing of adoption or entanglement, any claims against Cirrus arising solely from the opinions of third-party analysts must fail. *See id.* at 1377 (granting summary judgment on liability for analyst statements because, although Cypress regularly met with analysts, plaintiffs failed to produce any evidence "showing that Cypress even reviewed analysts' reports before they were published, let alone represented that the reports conformed to its internal projections"); *Syntex*, 95 F.3d at 934.

## B.

Defendants also argue that they cannot be held liable for allegedly misleading statements made *to* analysts, unless plaintiffs can prove Cirrus's entanglement with, or adoption of, the analysts' reports. This is not the law. Rule 10b–5 makes it unlawful to "make any untrue statement of a material

---

11. Defendants argue, halfheartedly, that there can be no liability under this entanglement theory because the Supreme Court eliminated aiding and abetting liability under § 10(b) in *Central Bank v. First Interstate Bank,* 511 U.S. 164, ——, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994). Defendants' argument was recently rejected by the district court for the Southern District of New York.

Here, plaintiffs' claim may be characterized as an aiding and abetting claim, but it may just as easily be characterized as a claim of primary liability, pled on the theory that defendants used PaineWebber as their agent to make false or misleading statements to the market. If claims of agency such as these did not give rise to primary liability under *Elkind* [*v. Liggett &*

*Myers, Inc.,* 635 F.2d 156 (2d Cir.1980)], then a corporation, acting with scienter, could use an analyst, acting without scienter, as its agent to make false statements to the market, and neither the analyst nor the corporation would be liable under § 10(b). The corporation would escape liability because it would be a mere aider and abettor; the analyst would escape liability because it lacked scienter. My view is that neither the Second Circuit, in *Elkind,* nor the Supreme Court, in *Central Bank,* intended this result.

*In re ICN/Viratek Sec. Litig.,* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,213 at 95,086 1996 WL 164732 (S.D.N.Y. Apr. 4, 1996). This Court adopts the well-reasoned view of the Southern District of New York.

fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). There is no exception for misleading statements made to investment analysts.

Defendants confuse the test under which they can be held indirectly liable for misleading opinions or statements *by* analysts or other third parties with the test under which they can be held directly liable for their own misleading statements *to* analysts. Defendants "cannot escape liability simply because [they] carried out [their] alleged fraud through the public statements of third parties." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.1996). *See also McGann v. Ernst & Young*, 95 F.3d 821 (9th Cir.1996) (finding accountant liable for providing fraudulent audit report to corporation where accounting firm knew report would be incorporated in 10–K and distributed to investors); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 164 (2d Cir.1980) (holding management could be liable for intentionally misstating material facts to analysts); *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 603 (N.D.Cal.1991) (where a company undertakes to pass on information to the market through analyst reports, it has a duty to correct materially misleading facts or omissions); *Colby v. Hologic, Inc.*, 817 F.Supp. 204, 215 (D.Mass. 1993) (dismissing claims based on analyst reports because plaintiffs failed to plead entanglement or adoption, "nor are any misstatements of *fact* by any of the defendants to the analysts described").

■ A company may not lie to securities analysts and avoid liability for its misrepresentations by refusing to adopt the analyst reports incorporating the misrepresentations. If a company chooses to speak to the market

on a subject, through an analyst or otherwise, it is obligated to make a full and fair disclosure to ensure that its statements are not materially misleading. *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1313–1314 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *In re Apple Computer Sec. Litig.*, 672 F.Supp. 1552, 1560 (N.D.Cal.1987), *aff'd in relevant part and rev'd in part*, 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

Cases requiring more than a one-way flow of information to show entanglement presuppose that the information provided by the company to the analyst is truthful and accurate. Clearly, a company cannot be held liable for another party's interpretation of accurate information provided by the company unless the company adopts the third-party statement as its own. No such two-way flow of information should be necessary, however, where the company deliberately or recklessly provides misinformation to the analyst.[12] *But see Stack v. Lobo*, 903 F.Supp. 1361, 1372 (N.D.Cal.1995).

■ The Court finds that a company may be liable under Rule 10b–5 for its own intentional or reckless misrepresentations to analysts that reach the market, whether or not the company adopts the resulting analysts' reports. *Cf. McGann*, 95 F.3d at 828; *In re ICN/Viratek Sec. Litig.*, [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,213 at 95,086, 1996 WL 164732 (S.D.N.Y.1996).[13] Plaintiffs, however, bear the *Basic*, 485 U.S. at 248 n. 27, 108 S.Ct. at 992 n. 27.

■ Plaintiffs assert, incorrectly (citing *id.* at 249 n. 29, 108 S.Ct. at 992 n. 29), that in a "fraud on the market" case such as this, the Supreme Court places the burden upon

---

**12.** Alternatively, one could characterize a company's intentional or reckless misrepresentations to analysts as a form of entanglement with statements in analysts' reports (or in other communications with the market) that rely on the misrepresentations.

**13.** The Ninth Circuit's opinion in *Syntex* initially appears to require a different conclusion. The Ninth Circuit upheld dismissal of allegations that company defendants were liable for analysts'

forecasts based on defendants' misrepresentations to the analysts on the ground that there was no allegation that defendants adopted or endorsed the analysts' statements. 95 F.3d at 934. *Syntex*, however, does not address the issue whether defendants could be directly liable for their own misrepresentations to the analysts, focusing instead on whether defendants could be liable for the analysts' interpretations of defendants' statements.

defendants to prove that their statements did *not* reach the market. The Supreme Court actually imposes a burden upon *plaintiffs* to prove that the defendants made *public* misrepresentations. *Id.* at 248 n. 27, 108 S.Ct. at 992 n. 27. Then, "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." *Id.* at 247, 108 S.Ct. at 992. Only upon such showing by plaintiffs that public statements were made does the rebuttable presumption of reliance attach. *Id.* at 246–47, 108 S.Ct. at 991–92; *In re Columbia Sec. Litig.,* 155 F.R.D. 466, 483 (S.D.N.Y.1994) (citation omitted) ("once plaintiffs have shown that materially misleading statements have been disseminated into a well-developed securities market, the burden shifts to defendants to [rebut the presumption of reliance by] 'sever[ing] the link' between the misstatements and market price—that is, [by demonstrating] that the statements had no effect on that market").

Of course, some statements to analysts, such as official conference calls or press conferences with a group of analysts, may be considered statements directly to the market, without further proof. These formal announcements are statements to the market not because the statements are made to analysts, but because they are *public* statements by the company. *See Basic,* 485 U.S. at 246 n. 24, 108 S.Ct. at 991 n. 24 (emphasis added) ("market professionals generally consider most *publicly announced* material statements about companies, thereby affecting stock market prices").

■ On the other hand, a private telephone conversation with a single analyst should not be considered a statement to the market without proof that the analyst relayed the information to the market in an analyst report or by other means. *Id.* at 248 n. 27, 108 S.Ct. at 992 n. 27 (placing the burden upon plaintiffs to prove that defendants' statements reached the market). It should not be presumed that any communica-

tion between a company and an analyst, however casual, is a statement directly to the market. Ordinarily, however, plaintiffs should have no difficulty proving that a company's private statements to an analyst reached the market. The analyst need only testify that his statements about the company in analyst reports or other communications with the market relied on the allegedly fraudulent statements made by the company to the analyst.

■ In their third amended statement of claims, plaintiffs allege that the individual defendants made various fraudulent statements about the company's business and prospects during private conversations with individual analysts.[14] In their oppositions to defendants' summary judgment motions, however, plaintiffs focus nearly exclusively on conversations by various individual defendants with Daniel L. Klesken ("Klesken") of Robertson Stephens & Co. Plaintiffs contend that, during these conversations, defendants made misrepresentations to Klesken that were statements to the market. Only two of these conversations are discussed in any detail by either party in the briefing on the summary judgment motion.

The first hurdle plaintiffs must overcome is proving that Cirrus made the various statements to Klesken that are attributed to it in Klesken's notes and analyst reports. In order to survive summary judgment, plaintiffs must establish the existence of a genuine issue of material fact through the submission of affidavits setting forth such facts as would be admissible in evidence. Fed.R.Civ.P. 56(e).

Plaintiffs offer (over defendants' objection) Klesken's analyst reports, and notes purportedly taken by Klesken during private conversations with Cirrus executives, to prove that Cirrus executives made certain allegedly fraudulent statements attributed to them in the reports and notes. As explained below, such evidence is inadmissible at trial to prove that the alleged statements were made.

---

14. Plaintiffs also seek to hold Cirrus liable for various public statements in the form of official conference calls, press releases, and public fil- ings with the SEC. These statements are the subject of Section V, below.

As an initial matter, plaintiffs argue that the notes and reports are not hearsay because the evidence is offered to show merely that statements were made, as opposed to the truth of the statements. In the present situation, the distinction defies logic. Plaintiffs hope to introduce the notes and reports to establish the actual content of statements by Cirrus executives. Accordingly, the notes and reports are offered to show the truth of the assertion that Cirrus made specific fraudulent statements to analysts. Such evidence clearly falls within the definition of hearsay under Rule 801(c) of the Federal Rules of Evidence. *Cypress,* 891 F.Supp. at 1374. *See also Larez v. City of Los Angeles,* 946 F.2d 630, 640–44 (9th Cir.1991) (holding that newspaper articles were inadmissible hearsay when used to prove that the defendant made the statements attributed to him in the article); *Seagate,* ¶ 98,530 at 91,583–84 (finding statement on Dow Jones news wire attributed to Seagate executive inadmissible hearsay if offered to prove that the executive made the statement).

▇ Plaintiffs offer three alternative bases for admissibility under exceptions to the hearsay rule outlined in Rule 803. First, they argue that Klesken's notes are admissible as present sense impressions pursuant to Rule 803(1). This exception to the hearsay rule permits the admission of statements "describing or explaining" an event or condition where "substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation." Fed.R.Evid. 803(1) and 1972 advisory committee notes. Here, however, Klesken has testified that his notes contain his interpretations and analyses of conversations with Cirrus executives. (Klesken Dep. at 37:6–9, 40:4–41:19, 49:2–6, 97:11–22.) Such interpretations constitute subjective input in clear violation of the theory underlying Rule 803(1). Klesken's notes are not admissible as present sense impressions.

▇ Second, plaintiffs argue that the notes and reports are admissible as business records under Rule 803(6). A hearsay statement is admissible as a business record if the writing was made by a person with knowledge at or near the time of the incident recorded, and the record is kept in the course of a regularly conducted business activity. *Kennedy v. Los Angeles Police Dept.,* 901 F.2d 702, 717 (9th Cir.1989). The record is not admissible, however, "if the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* (citation omitted).

Here, Klesken himself has indicated the lack of accuracy of the proffered evidence with regard to the exact content of conversations with Cirrus executives. There is no way to distinguish Klesken's own statements and opinions from those of the Cirrus executives. Moreover, in the absence of proof of entanglement or adoption, a company obviously has no control over the way its statements are transcribed in an individual's notes, nor in the way its statements are presented in analyst reports or in the press. There is no guarantee that the statements are transcribed accurately, nor that the reported statements include any material qualifications provided by the company necessary to make the reported statements not misleading.

It is plainly unfair to hold defendants liable for the reporting of their statements by third parties without independent corroboration of the accuracy of the reported statements. *See Raab v. General Physics Corp.,* 4 F.3d 286, 288 (4th Cir.1993) ("Without control over Goldman Sachs's report, any statement made by General Physics personnel could be taken out of context, incorrectly quoted, or stripped of important qualifiers."); *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1237 (N.D.Cal. 1994) ("Analysts might quote corporate spokespersons out of context or inaccurately interpret remarks made by corporate insiders."). Klesken's notes are, therefore, not admissible as business records. Nor are the analyst reports admissible as business records to prove the statements attributed to Cirrus in the reports, because the analyst reports are clearly based on the analysts' notes.

▇ The same lack of reliability precludes introduction of the notes or reports as admissions of a party opponent pursuant to Rule 801(d)(2). Klesken's interpretation and

analysis of his conversations with Cirrus executives cannot be deemed to be admissions of the defendants.

Finally, plaintiffs argue that the evidence is admissible under the "catch-all" hearsay exception contained in Rule 803(24) of the Federal Rules of Evidence. The general requirements to admissibility under this exception demand that the evidence be more probative on the point for which it is offered than any other evidence the proponent could produce through reasonable efforts. *Larez,* 946 F.2d at 642. The court must balance the need for the evidence against its trustworthiness. *Columbia,* 155 F.R.D. at 475. Plaintiffs must demonstrate that the analyst who authored notes or a report is unavailable to testify to his or her recollection of the conversation reflected in the notes, *and* that the notes and reports have circumstantial guarantees of trustworthiness, i.e., that they accurately document the conversations. (*See* Fed.R.Evid. 803(24) and 1974 advisory committee notes.) Otherwise, the material is not admissible to prove that Cirrus made the statements attributed to it in the report.

For the reasons stated above, Klesken's notes, representing his interpretation of what was said, may not be considered trustworthy evidence of Cirrus's statements. The reports, based on the notes, are similarly untrustworthy. Thus, the notes and reports are inadmissible under Rule 803(24) to prove that Cirrus made the statements attributed to it. *See Columbia,* 155 F.R.D. at 475 (citations omitted) ("[Even n]ews accounts, unsupported by corroborating evidence and offered to prove that certain statements were made, will usually lack the 'circumstantial guarantees of trustworthiness' that Rule 803(24) requires' "). Klesken must testify as to his recollection of the entire conversation with the company executive to ensure that the Court views the allegedly misleading statements in their proper context.[15]

If plaintiffs can prove, however, from evidence other than Klesken's reports or notes, that defendants made the allegedly misleading statements to Klesken, then Klesken's

published reports should be admissible, but only as evidence that the statements reached the market. *See Columbia,* 155 F.R.D. at 474. *Cf. Warshaw,* 74 F.3d at 959 ("if defendants intentionally misled securities analysts and the press in order to stave off a Xoma stock sell off, then these third-party reports would be relevant to determine Xoma's securities fraud liability").

Based on the foregoing, the Court must grant summary judgment for defendants on all of plaintiffs' claims of fraud based on statements attributed to Cirrus in Klesken's analyst reports or notes that cannot be independently corroborated. Such corroboration may come in the form of testimony from the parties who participated in the conversations documented in the notes and reports. Where memories have faded, such corroboration may exist, under Rule 803(24), when the notes of several parties who participated in the conversation each contain reference to the statements allegedly made by the company executive. *See Larez,* 946 F.2d at 643; *United States v. Valdez–Soto,* 31 F.3d 1467, 1471 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1969, 131 L.Ed.2d 859 (1995) ("we've recognized that corroborating evidence is a valid consideration in determining the trustworthiness of out-of-court statements for purposes of Rule 803(24)").

The Court also must grant summary judgment for defendants for all statements to Klesken that did not reach the market. Because it is unclear from the record precisely which claims are based on allegedly fraudulent statements by defendants that appear solely in Klesken's notes and reports, or that did not reach the market, the Court leaves it to the parties to determine precisely which statements are no longer in the case. Should the parties be unable to agree, motions in limine are the appropriate remedy.

## V.

The Court turns now to the third motion for summary judgment, regarding plaintiff's allegations that defendants violated Rule

---

**15.** Of course, Klesken's reports and notes could be used, if needed, to refresh his recollection of the conversations at issue.

10b–5 by making misleading public statements relating to revenue, gross margins, the PCSI merger, and other aspects of Cirrus's financial condition.[16] Plaintiffs also allege that defendants omitted to disclose material facts relating to Cirrus's revenues and gross margins. Because statements and alleged omissions must be analyzed in context, *see, e.g., Syntex,* 95 F.3d at 928–29; *Worlds of Wonder,* 35 F.3d at 1414, the Court addresses each corporate communication in sequence below.

### A.

#### 1. *October 22, 1992 Press Release.*

On October 22, 1992, Cirrus issued a press release and held a teleconference call with research analysts to release Cirrus's second quarter 1993 financial results. Defendants Hackworth, Bartek, and Srinivasan participated in the conference call, which included a question and answer session. The press release reported revenues for the quarter ended September 30, 1992 of $76.3 million (up from $63 million in the first quarter) and earnings of $0.36 per share (up from $0.20 per share in the first quarter). (UF ¶ 113.) The press release also stated:

> This quarter we saw record revenues across all product lines as well as record operating income and earnings per share.... We're entering the third quarter with an excellent order backlog because of the growth in unit demand for personal computers and continuing market acceptance of our new products.

(UF ¶ 114.)

Defendants contend the challenged statement in the October 22, 1992 press release was not misleading because total revenue for the second quarter *was* a record, earnings per share had increased from $0.20 to $0.36, and Cirrus's order backlog entering the third quarter was $98 million, representing a substantial increase over the $62 million backlog

entering the second quarter. (Hackworth Decl. ¶ 44.) Plaintiffs do not offer any evidence controverting this claim.

Accurate statements of historical fact such as these are not actionable. *Cf. Convergent,* 948 F.2d at 513 ("The challenged statements do not imply any comparison between the rate of past and future growth. They simply report past performance and assert specific limited predictions for the future."). Moreover, "[s]tatements regarding past events contain no implicit prediction that those events or conditions will continue in the future." *Caere,* 837 F.Supp. at 1058 (citations omitted). Plaintiffs' fraud claim based on the October 22, 1992 press release therefore must fail.

#### 2. *October 22, 1992 Conference Call.*

The challenged statements made during the conference call and addressed on summary judgment are as follows:

##### a. *Statements Concerning Revenue.*

1. "While orders were strong in the disk drive area, the growth rate is more in line with market growth, while in our graphics products, the growth rate is more reflective of strong market share gain, as well as market growth." (UF ¶ 115.)

2. "Older products for the disk drive market are surprisingly healthy." (UF ¶ 116.)

3. "The overall market continues to feel strong. The outlook is for continued strength in disk drive unit shipment growth for 1993. The PC market continues with strong unit expansion, apparently driven by low prices as well as total globalization of the PC." (UF ¶ 117.)

4. "Visibility strong as ever—unit demand quite strong." (Def.Ex. 15.)

Plaintiffs characterize these statements as false or misleading statements pertaining to the strength of Cirrus's disk drive business. They claim that Cirrus should have disclosed (1) that its internal revenue forecasts for the

---

16. Any reiterated claims arising out of or relating to the assertedly fraudulent nature of Cirrus's third quarter financial statements, having been held to fail as a matter of law, are not addressed below. Moreover, the Court does not consider arguments offered only in the third amended statement of claims to be part of the summary judgment briefing, despite plaintiffs' attempt to incorporate by reference the eighty-nine-page third amended statement of claims in their oppositions to these motions. The Court will not allow plaintiffs so blatantly to evade the page limitation for opposition briefs.

Mass Storage and User Interface Divisions were declining, and (2) that Cirrus had problems with customers.[17] They base their argument on defendants' alleged knowledge that Cirrus's mass storage business was declining at the time these statements were made, citing as evidence a number of internal memoranda, reports, and customer demand forecasts. These memoranda and reports include the following: [18]

1. A July 7, 1992 memorandum to Hackworth, Srinivasan, and others discussing potential pricing problems;

2. An August 25, 1992 memorandum that cautioned management about overbuilding in the disk drive market, stating that "[a] clear 'bubble' of potential over capacity in the disk drive industry could emerge as early as [the December 1992 quarter]" and that the Cirrus's forecasts for that quarter could be off by up to 10% (Def.Ex. 33 (emphasis deleted));

3. A September 14, 1992 memorandum to Hackworth, Srinivasan, and others entitled "Operations Staff Minutes & Open Action Items/Friday, 11 September 1992" that stated, "[e]xpect product mix changes at Conner and lower demand going forward" and "Cobra demand significantly lower going forward" (Pl.Ex. 368 at 1);

4. A September 17, 1992 demand forecast showing a downward revision in third quarter Mass Storage estimates;

5. A September 18, 1992 internal projection of FY93 revenue for Mass Storage of $150.5 million, down from the August forecast of $158 million, principally because of lower demand for the Cobra, Viper, and Cardinal products;

6. An October 8, 1992 demand forecast showing downward revisions in third and fourth quarter Mass Storage and User Interface estimates;

7. An October 13, 1992 memorandum to Srinivasan and others, stating, "[w]e have

recently experienced many reschedules & cancellations of product" (Pl.Ex. 549); and

8. An October 16, 1992 internal projection of FY93 revenue for Mass Storage of $140 million, down from the September forecast of $150.5 million, principally because of lower demand from Conner, Seagate, and Maxtor.

Defendants claim that the first statement, relating to growth rate, is not actionable because it is true. Cirrus's mass storage bookings for the second quarter were $37.8 million, the highest in the Company's history and a significant increase over first quarter bookings of $34.3 million. (Def.Ex. 722.) Overall bookings rose even more significantly, from $64.2 million to $80.8 million. (Def.Ex. 722.) Defendants maintain that, because of Hackworth's statement that mass storage growth tracked the growth of the market, the communication was, overall, a cautionary one.

With respect to the second statement, relating to the health of older products for the disk drive market, defendants maintain that this statement was consistent with Cirrus's October forecasts predicting that demand for older mass storage products would remain strong into calendar 1993 (Hackworth Decl. ¶ 46) and, therefore, had a reasonable basis. They maintain it is too vague to be actionable, see Caere, 837 F.Supp. at 1057–58, and characterize the remainder of the disputed statements as general statements about the PC market also too vague to be actionable.

■ In order to prevail in a fraud-on-the-market case such as this, plaintiffs must "demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." Convergent, 948 F.2d at 512. Where plaintiffs claim, as here, that failure to disclose internal forecasts constitutes a material omission that "render[s] the company's forward-looking statements misleading," in order to defeat summary

---

**17.** Plaintiffs focus almost exclusively on the first of these contentions, citing little in the way of *facts* to support the view that Cirrus had problems with customers.

**18.** Plaintiffs also offer as evidence several memoranda from November 1992. These have not been addressed because plaintiffs have failed to establish their relevance to the issue whether defendants' statements on October 21, 1992 had a reasonable basis or were materially misleading.

judgment plaintiffs "must show that [d]efendants had a legally cognizable duty to disclose the projections." *Lyondell*, 984 F.2d at 1052.

■ As a general rule, a company has no duty to disclose internal projections. *Provenz*, 95 F.3d at 1386; *see also Lyondell*, 984 F.2d at 1052–53 ("[a] corporation may be called upon to make confidential projections for a variety of sound purposes where public disclosure would be harmful"); *Convergent*, 948 F.2d at 516 ("[i]t is just good general business practice to make … projections for internal corporate use") (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d at 1214, 1221 (9th Cir.1980)); *Stac*, 89 F.3d at 1411 (citation omitted) ("Issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed has a 'reasonable basis.'"). A company does, however, have a duty to disclose internal projections that are made with "reasonable certainty." *Provenz*, 95 F.3d at 1386 (quoting *Convergent*, 948 F.2d at 516). Moreover, "a company has a duty to disclose the financial data and other material information upon which an internal forecast is based." *Id.*

■ In *Provenz*, the Ninth Circuit reversed the district court's grant of summary judgment for defendants on a number of claims, including a claim that statements by a company executive on a conference call to analysts were misleading in light of his failure to disclose certain internal projections. Although the executive predicted second quarter earnings would be close to the $624,000 reported for the first quarter, a spreadsheet prepared eight days before the conference call showed that the company forecasted internally a $4,000,000 loss for the second quarter. *Id.* Relying on testimony of company employees that the internal forecast represented " 'the best, most accurate representation as of the time it was prepared of what the company's financial results [would] be like for the prospective quarter,' " and the fact that defendants had not disclosed to analysts either the projection or the financial information on which the internal forecast was based, the court found plaintiffs had raised a genuine issue of material fact with respect to whether defendants' statements during the conference call were misleading. *Id.*

This is not such a case. Far from representing the "best, most accurate representation … of the company's financial results" for the prospective quarter, *id.*, the documents cited by plaintiffs, evidently designed to raise concerns and present action items, do not appear to have been prepared with anything approaching the level of certainty required for public disclosure. These are precisely the type of internal forecasts meant for internal use that a company is not required to disclose. Plaintiffs have offered no evidence that defendants were aware of any adverse *facts* that undermined the validity of their public statements and, thus, the claim falls squarely under *VeriFone*, 11 F.3d at 869 (emphasis added) (citations omitted) ("[a]bsent allegations that [the company] withheld financial data or other existing *facts* from which forecasts are typically derived, the alleged omissions are not of material, actual *facts*. Therefore, the forecasts need not have been disclosed, and the failure to make the omitted forecasts did not render other statements that were made misleading").

In addition, defendants have offered evidence that Cirrus's internal projections for the Mass Storage division, even after downward revision, were in line both with Wall Street estimates and actual results for the quarter. This is also true for revenues as a whole. This suggests that defendants' statements had a reasonable basis, and that the market was not misled.

Thus, even though the Court finds the disputed statements not too vague to be actionable as a matter of law under *Caere*, and even construing the evidence in the light most favorable to the nonmoving party, the Court finds that plaintiffs have failed to raise a genuine issue of material fact with respect to whether the disputed statements were misleading.

b. *Statements Concerning Gross Margin.*

■ During the October 22, 1992 conference call, Hackworth made the following statement with respect to gross margin:

[G]ross margin was off about one percentage point from last quarter and Sam will cover this further in his report. Capacity has ramped superbly during the quarter and supply/demand will be in line by November.... Since we have been surprisingly successful in obtaining significant incremental wafer capacity commitments ... in fact, well in excess of our perceived demand ... we have decided to continue to press Acumos' original low-end/low-margin VGA chips into the low-end of the market, and given surplus capacity, they represent EPS that should not be left for the competition. We remain committed to our 50% [gross margin] model, and based on our current robust flow of new products in the second half of this fiscal year, we continue to believe the company is well positioned for a continuing upward bias in gross margin for the long run.

(UF ¶ 118.) [19]

Plaintiffs contend these statements were false and misleading when made. At the time of the call, they assert, both Hackworth and Srinivasan were aware that margins in Cirrus's two largest divisions, Mass Storage and User Interface (representing a significant portion of Cirrus's revenues and earnings), were under "severe pressure." (Pl. Opp'n at 8–9.) They cite as evidence the following: [20]

1. Cirrus-prepared charts indicating a downward trend in margins over the past several quarters;

2. An October 15, 1992 internal projection showing margins for the Mass Storage division for the third and fourth quarters lower than for the second quarter;

3. A graph in Cirrus's October 19, 1992 Operations Review Package entitled "CRUS Gross Margin %" indicated that Cirrus's gross margin for the second quarter of fiscal 1993 was 46 percent. (UF ¶ 119.) This graph projected that gross margins for the third and fourth quarters of fiscal 1993 would be 46.7 percent and 46.4 percent, respectively (UF ¶ 119); and

4. An October 21, 1992 memorandum to Hackworth and Bartek, prepared in anticipation of the analyst conference call, that indicates that costs in the User Interface division "do not show adequate improvement over time." (Pl.Ex. 531.)

Defendants contend, first, that Hackworth's statement clearly discloses a *decline* in gross margin for the present quarter, predicting a return to 50 percent margins only over the long run. In their view, the reference to the sale of "low-end/low-margin VGA chips into the low-end market" was cautionary, further clarifying that 50 percent margins would not be achieved in the near future. Defendants also contend that Hackworth's statements had a reasonable basis, and were not inconsistent with Cirrus's internal forecasts. Finally, defendants maintain that Hackworth's statements that "we remain committed to our 50% [gross margin] model" and that Cirrus is "well positioned for a continuing upward bias in gross margin for the long run" were too vague to be actionable. *See Caere*, 837 F.Supp. at 1057–58 (statement that company was "well positioned" for growth held too vague to be actionable).

Plaintiffs have failed to offer evidence sufficient to raise a genuine issue of material fact with respect to whether these statements were misleading. Although reasonable investors could disagree with respect to whether Hackworth's statements predicted a near term decline in gross margin, as defendants allege, there can be no dispute that his reference to Cirrus's continuing commitment to the 50 percent gross margin model, and

**19.** According to notes taken during the call, management indicated that margins were affected by the payment of expediting costs, that "[e]xpediting variance should clear in this quarter," and that Cirrus would "[r]each GM [target]—early in FY93." (Def. Ex. 41.) Defendants contend these handwritten notes are unreliable, and contained an obvious error (Cirrus was already in the second half of FY93, so could not possibly achieve an improvement in gross margins by early FY93).

As described earlier in the Court's analysis, such notes are not admissible without corroborating evidence.

**20.** Again, plaintiffs also cite memoranda dated late November in support of their contention that Hackworth's statements in the October conference call were materially misleading, but fail to establish their relevance.

Cirrus's expectations for "a continuing upward bias in gross margin for the long run," were long-term predictions only. None of the evidence cited by plaintiffs "seriously undermine[s]," *Wells Fargo,* 12 F.3d at 930 (internal quotation marks omitted), the validity of these statements, or defendants' evidence that the statements had a reasonable basis when made.

### 3. *Form 10-Q for Second Quarter.*

■ On October 28, 1992, Cirrus filed its Form 10-Q for the second quarter. Plaintiffs challenge, in their third amended statement of claims, the following statement in the 10-Q:

> Net sales for the six months of fiscal 1993 were $139.3 million, an increase of 31% over the $106.0 million reported for the same period of fiscal 1992. The revenue increase during fiscal 1993 compared to 1992 was largely due to an increase in sales of mass storage, display graphics, and audio and data conversion products. Mass storage revenue was driven by a combination of the strong demand for lower capacity products and increased demand for the new high capacity 3.5-inch drives and new small-form-factor disk drives.

(Defs. Ex. 351.)

Defendants assert that, as statements of historical fact, these statements are not actionable because they were true. *See Convergent,* 948 F.2d at 512–13. In addition, they point to cautionary language in the 10-Q that warns of the risks facing Cirrus in the third quarter, in particular with respect to gross margins and the mass storage division:

> The marketplace is highly competitive with product price being a highly determinative selection criteria. There can be no assurance that the Company will continue to compete successfully as to these factors. Therefore, the current gross margin percentage may not be sustainable.
>
> . . . .
>
> ... The disk drive industry also has been characterized by rapid growth followed by periods of oversupply and contraction. The Company believes that a slowdown in sales in the personal computer and work-station market would affect the Company's sales and earnings.
>
> ... Operating results are often subject to significant forces because of new products, new manufacturing technologies and rapid escalation of demand for some products in the face of equally steep declines in demand for others....

(Def. Ex. 351.)

Plaintiffs' opposition does not address these statements in the 10-Q. Accordingly, as a matter of law, any fraud claims arising out of these statements must fail.

### 4. *December 21, 1992 Conference Call re PCSI Merger.*

■ On December 21, 1992, Cirrus held another analyst conference call, this time regarding the acquisition of PCSI. (UF ¶ 120.) Reading from a prepared script during the call (UF ¶ 121), Srinivasan explained how the PCSI merger would affect Cirrus:

> The transaction will be accounted for as [a] pooling of interests.... We expect that all these conditions will be met and the deal will be consummated in the middle of February 1993. That means the Dec. qtr. financials will not reflect this transaction. (By the way, we will be releasing our 3rd quarter financial results on January 21st, 1993 and will have the conference call that afternoon.) The financial statements of [the] March quarter, which is our 4th quarter for fiscal FY 93, will contain the cost of this merger transaction. Also, please note: the Restated financial statements will be reported in this year's Annual reports and will be available to you in May–June time frame.

(Def. Ex. 365.) In discussing PCSI's operating results, Srinivasan stated, "[i]n terms of operating income, PCSI was profitable for the September quarter but will [show] a loss for the year 1992 as a whole because they lost money during the early quarters." *Id.*

Srinivasan had this to say, specifically, about the financial impact of the merger on Cirrus:

> As I mentioned earlier, there won't be any impact in the current December quarter because the deal will not be completed until the middle of February. In the

March quarter, our p & l will be affected in 2 ways:

First. We expect that the one-time acquisition cost charged to P & L will be approximately $2—$2.5 million.

Secondly. Our P & L will be consolidated with PCSI's financial results, including the adjustment of inventory and other reserves of PCSI to conform with Cirrus Logic's policies.

The total impact of these two items is likely to cause a reduction in e.p.s. of about 10 cents to 15 cents in Q4 of FY 93 (i.e., in our March qtr).

*Id.*

On February 1, 1993, Cirrus received PCSI's audited 1992 financial statements, including adjustments. (UF ¶ 123.) Three days later, Cirrus submitted pro forma combined financial statements to the California Department of Corporations in connection with a public fairness hearing on the proposed merger to be conducted on February 19, 1993. (UF ¶ 123.) The pro forma financial statements included restated historical figures for the combined company for the first three quarters of fiscal 1993 (March 1992–December 1992). (UF ¶ 123.) On March 15, 1993, Cirrus filed its Form 8–K for the merger but did not include the required restated financial statements. These were not filed with the SEC until April 2, 1993, in an amendment to the Form 8–K.

Plaintiffs' fundamental complaint with respect to the PCSI announcement relates to the statement, "the Dec. qtr. financials will not reflect this transaction." (Def.Ex. 365.) In their view, the statement indicated to the investing public that the merger with PCSI would have no effect on Cirrus's third quarter financials. They maintain that Srinivasan's estimate of a "total" 10 to 15 cent per share impact was materially misleading in light of defendants' knowledge at the time the announcement was made that the third quarter financials would have to be restated downward, perhaps significantly.

Because defendants' officers had completed their due diligence on the valuation of PCSI by December 17, 1992, at that time concluding that PCSI's reserves were inade-quate by $5 to $6 million and that PCSI expected to incur a loss of $1,115,000 through November 30, 1992, plaintiffs contend that defendants should have disclosed that, in addition to the anticipated effect on fourth quarter earnings, the acquisition would result in a significant downward restatement of previously reported third quarter earnings. As it happened, on April 26, 1993, defendants announced to the public that Cirrus's previously reported third quarter earnings of 46 cents per share were to be restated downward to 28 cents per share as a result of the merger, and that earnings for the fourth quarter would be 10 cents per share.

Defendants argue that Srinivasan's statements (this was a pooling of interests transaction, PCSI was losing money, and the merger would not be completed until February) made clear to the market that, although the third quarter financials would not reflect the PCSI transaction because the merger would not have been completed at the time Cirrus financials were released, eventually these financials would be restated downward to give effect to the merger. They also maintain (as is borne out by the text of the statement above) that Srinivasan's estimated impact of 10 to 15 cents per share clearly pertained to the *fourth quarter only.*

In determining whether Srinivasan's statements were misleading, the Court must apply a "reasonable investor" standard. *See, e.g., Durning,* 815 F.2d at 1268. It may be true, as defendants allege, that no reasonable investor could have failed to understand that (1) a statement to the effect that December quarter financials would not reflect the merger, set to close in February, necessarily referred only to historical financials for Cirrus, not to pro forma financials for the combined entity, and (2) the application of pooling treatment to the merger, given PCSI's historical losses, would result in the downward restatement of Cirrus's previously reported financial results. Nevertheless, and although defendants allege they did not have definitive financial information at the time of the December conference call, the Court finds that plaintiffs have raised a genuine issue of material fact with respect to whether Srinivasan

should have disclosed at that time a potential material inadequacy in PCSI's reserves.[21]

Turning to scienter, defendants allege that the evidence negates any inference of fraudulent intent. Defendants' stock sales in late October and early November 1992, they maintain, did not involve suspicious amounts and were not made at suspicious times and, thus, cannot support an inference of scienter. *Cf. Apple,* 886 F.2d at 1117 ("cases basing a finding of bad faith on insider trades have involved trades in amounts dramatically out of line with prior trading practices at times calculated to maximize personal benefit"). Moreover, they offer uncontroverted evidence of "credible and wholly innocent explanations for the stock sales...." *Id.* If defendants had been engaged in a scheme artificially to inflate Cirrus's stock price to maximize their personal benefit, defendants argue, it would have been foolish to complete their trading activity before the bulk of the allegedly fraudulent statements were made, as was the case here.

Plaintiffs do not address these arguments, citing instead another potential motive for fraud—to insure a favorable exchange ratio for the PCSI merger. By the terms of the PCSI transaction, if the closing price of Cirrus common (defined as the average closing price of Cirrus common for the ten days prior to the December 21, 1992 signing and for the ten days prior to the February 1993 closing) were to fall below $30 per share, the number of shares required to be exchanged would increase. Although one way to establish scienter is to show motive and opportunity, *see Wells Fargo,* 12 F.3d at 931, this circumstantial evidence of motive, standing alone, does not support an inference of scienter (if it did, nearly every stock-for-stock transaction conducted in the United States could be subject to challenge). Coupled with the evidence of Srinivasan's knowledge of potential reserve inadequacies, however, this evidence suffices to raise a genuine issue of material fact with respect to scienter. Summary judgment must, therefore, be denied with respect to plaintiffs' claims arising out of the December 21, 1992 conference call regarding the PCSI merger.

### B.

**1.  *January 21, 1993 Press Release.***

On January 21, 1993, Cirrus issued a press release and held an analyst teleconference call to release Cirrus's results for the third quarter. Reported revenues for Q3FY93 were $91.7 million, with earnings per share of $0.46. (UF ¶ 122.) Plaintiffs appear to challenge only one statement in the press release, Hackworth's statement that "[w]e experienced significant quarter-to-quarter and year-to-year increases in both revenues and net income." (Pl.Ex. 854.) On its face, based on the financial results reported, this is a true statement. It, therefore, cannot be actionable.

**2.  *January 21, 1993 Conference Call.***

**a.  *Statements Concerning Revenue.***

Plaintiffs challenge the following statements concerning revenue made by Cirrus executives during the conference call:

1.  "Overall PC market continues to look strong for this and next quarter ... inventories lean, in spite of record ships...." (Def.Ex. 758.)

2.  "In all, it was a terrific quarter.... the market remains strong for now.... customers are optimistic. We are bullish in our planning for growth in our upcoming fiscal year. Since the 20% quarter-to-quarter grow rates we have seen since March equals 2x/yr & isn't realistic at our size co., [e]xpect the secular quarter growth rate to cool down for a while." (Def.Ex. 586.)

3.  Mass Storage experiencing "[r]ecord revenue—still growing strong." (Def.Ex. 58.)

Defendants claim these statements, viewed in context and in their entirety, were cautionary. To support this assertion, they cite additional statements made during the conference call to the effect that gross margin could be "flattish" over the next couple of

---

21. *Cf. Stac,* 89 F.3d at 1406 (quoting *Convergent,* 948 F.2d at 515) (" 'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit' ").

quarters (Def.Ex. 58), and that the 40 megabyte disk drive was "dead" and the 60 and 80 megabyte disk drives were "dying." (Def.Ex. 758). Defendants also argue that the statements were reasonably based on internal forecasts, and too vague to be actionable.

Plaintiffs argue, by contrast, that the statements were false or misleading when made. In support of this view, they cite the following:

1. A note made on January 14, 1993 by the assistant controller to the effect that "[d]isk drive business is going down, quarter to quarter." (Def.Ex. 600.)

2. Notes from the January 21, 1993 Mass Storage Operations Review meeting that indicated, "[d]rive industry entering period of overbuilding—watch out for 10% overbuild by Conner." (Pl.Ex. 843.)

3. A January 25, 1996 memorandum to Hackworth, Srinivasan, and others warning that Mass Storage revenues for the quarter could be as low as $30.8 million net if certain objectives were not met with respect to Conner.

4. A January 29, 1996 memorandum to Hackworth, Srinivasan, and others indicating that the current revenue estimate for Mass Storage was $31.9 million gross or $31.6 million net versus the $34.5 million forecast.

Defendants correctly point out that, at the time of the January 22, 1993 conference call, the internal forecast for revenue for the Mass Storage division was $34.6 million. The existence of memoranda after the date of the call raising concerns and discussing action items related to Mass Storage revenues does not undermine the validity of the original statements on the call. Nor does the fact that defendants' optimism ultimately proved unfounded make the statements untrue when made. *See, e.g., Syntex,* 95 F.3d at 934 (citing *VeriFone,* 11 F.3d at 871). Moreover, Cirrus's overall revenues for the fourth quarter exceeded market expectations, which had been influenced in part by a number of widely-publicized articles and reports in late February discussing turmoil in the disk drive industry (*see, e.g.,* Def.Ex. 761, 762, and 763), so it is difficult to see how plaintiffs were

misled. *Cf. Syntex,* 95 F.3d at 933 ("[d]efendants' general statements of optimism were curtailed by general uncertainty in the market based on the common knowledge that" the company's patent was about to expire).

b. *Statements Concerning Gross Margin.*

■ Disputed statements concerning gross margin, as identified by the defendants, are as follows:

1. "On the pricing front ... we anticipate pricing will be used by our customers more and more as a competitive weapon, especially drive manufacturers. This would translate to price pressure on us. We are responding with higher level integration, higher value added products to help them be more competitive at the system level, while still protecting our margins, but our older products would still experience strong price pressure. We have a number of aggressive cost reduction programs to meet this challenge. Depending on the ongoing strength of older products, this could result in a flattish gross margin percentage over the next few quarters." (Def.Ex. 586.)

2. "Available drive supply now satisfying demand—potential for price pressure sooner than originally expected on these products." (Def.Ex. 758.)

3. "We said [gross margin] would be flattish. Back to 50% in FY94—[w]e are still very much committed to that. Will be flattish for another qtr. or 2." (Pl. Ex. 58.)

Plaintiffs challenge defendants' gross margin statements largely on the grounds that at the January 21, 1993 Operations Review meeting, defendants learned that projected fourth quarter margins had dropped to 45.2 percent. Moreover, they offer evidence of an internal discussion on January 19, 1993, relating to gross margin problems, in which it was suggested that gross margin would decline further to 44 percent in the first quarter of fiscal 1994.

Defendants contend that the first two statements were cautionary and therefore not actionable, citing in support of this contention a downward revision in projections after the conference call by Wall Street analysts. Defendants concede that at the Janu-

ary Operations Review meeting, gross margin was projected to fall from 46.6 percent in the third quarter to 45.2 percent in the fourth quarter. They maintain, however, that the projected drop was not inconsistent with the statement that gross margin would be "flattish" over the next few quarters, particularly when viewed in conjunction with the warning during the call that the PCSI acquisition would negatively affect margins. Moreover, even though actual gross margin was only 41 percent in the fourth quarter, defendants maintain that most of the difference between the actual gross margin and the forecasted 45.2 percent was caused by inventory reserves and write-offs that were not anticipated until after the end of the fourth quarter.

■ With respect to plaintiffs' assertion that Cirrus's estimate that gross margin would reach 50 percent in fiscal 1994 was "blatantly false" (Pl. Opp'n at 21), defendants correctly point out that the lower forecasts for the fourth quarter plaintiffs rely on in their opposition were made *subsequent* to the conference call. In short, plaintiffs have failed to provide any evidence that defendants made false and misleading statements with respect to gross margin during the January conference call.

### 3. *Form 10–Q for Third Quarter.*

■ Cirrus's assistant controller wrote a note to himself, dated January 14, 1993, to include in the MD & A section of the third quarter 10–Q such points as "pricing is a factor" and "[d]isk drive business is going down, quarter to quarter." (Def.Ex. 600.) Plaintiffs contend that the absence of such language represents a material omission. With respect to the pricing issue, defendants counter by pointing to language elsewhere in the 10–Q that expressly discloses the risk of price competition in the disk drive business:

> The marketplace is highly competitive with product price being a highly determinative selection criteria. . . .
>
> . . . . .
>
> . . . The price competitive nature of the disk drive industry could continue to put

pressure on the price of disk drive components, including the Company's products. (Def.Ex. 354.)

As discussed earlier, Cirrus has no duty to disclose internal forecasts for its divisions. *See, e.g., Convergent,* 948 F.2d at 516. Although historical declines in mass storage revenue would require disclosure, plaintiffs have offered no evidence to suggest that this statement referred to historical rather than projected results, nor is such an inference supported by Cirrus's historical financial statements. Thus, the Court finds that plaintiffs have not raised a dispute of material fact with respect to the accuracy of Cirrus's third quarter 10–Q.

### VI.

Accordingly,

IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment is GRANTED on all of plaintiffs' claims for accounting fraud, except with respect to Cirrus's third quarter inventory reserve calculations for the GC 45 D–Servo and Stingray product lines.

2. Defendants' motion for summary judgment is GRANTED on all of plaintiffs' claims that defendants are liable for adopting allegedly misleading opinions by third party securities analysts.

3. Defendants' motion for summary judgment is GRANTED on all of plaintiffs' allegations that defendants fraudulently misled securities analyst Daniel L. Klesken, but only to the extent plaintiffs rely on statements (a) attributed to defendants that appear *only* in Klesken's notes and reports and that cannot be corroborated from other sources, or (b) that did not reach the market.

4. Defendants' motion for summary judgment is GRANTED on plaintiffs' claims that defendants made fraudulent public statements in Cirrus's October 22, 1992 press release and conference call, Form 10–Q for the second quarter, January 21, 1993 press release and conference call, and Form 10–Q for the third quarter.

5. Defendants' motion for summary judgment is DENIED on plaintiffs' claims that

defendants made fraudulent public statements during Cirrus's December 21, 1992 conference call regarding the PCSI merger.